# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 14-111** |
| **TOSH TOUSSAINT** | **SECTION: "G"(5)** |

## ORDER AND REASONS

Before the Court is Defendant Tosh Toussaint's ("Toussaint") "Motion to Suppress Evidence and Statements."[1] Having considered the pending motion, the memoranda in support, the memoranda in opposition, the record testimony and the applicable law, the Court will grant the pending motion.

## I. Background

On June 5, 2014, Toussaint was charged by an indictment with one count of possession with the intent to distribute a quantity of a mixture or substance containing a detectable amount of cocaine base ("crack"), one count of possession of a firearm in furtherance of a drug trafficking crime, and one count of possession of a firearm by a convicted felon.[2]

On the evening of November 3, 2013, Federal Bureau of Investigation ("FBI") Special Agent Keith Burriss ("Burriss") was monitoring a wiretap on the phone of Robert Williams, a suspected leader of a drug trafficking organization operating on the Westbank area of Louisiana. Burriss heard what he interpreted to be a credible threat of violence against an individual driving a silver Infiniti

---

[1] Rec. Doc. 46.

[2] Rec. Doc. 1. The Indictment lists Toussaint's prior convictions as: "a January 6, 2010 conviction in the 24th Judicial District of Louisiana for Second Degree Battery, in violation of Louisiana Revised Statute 14:34.1; and an October 31, 2011, conviction in the 24th Judicial District of Louisiana for Possession of Marijuana Second Offense, in violation of Louisiana Revised Statute 40:966(D)(2)." *Id.*

coupe. Later that evening, Jefferson Parish Sheriff's Office ("JPSO") officers conducted a "routine" traffic stop of a silver Infiniti coupe driven by Toussaint near the Kennedy Heights neighborhood in Avondale, Louisiana. Toussaint initially complied with the stop, but fled when he was asked to produce his driver's license. He was placed under arrest by JPSO officers. A search incidental to Toussaint's arrest revealed a stolen firearm and approximately 10.5 grams of crack cocaine in his possession.

On June 12, 2015, Toussaint filed the instant motion to suppress the admission of the cocaine and firearm seized from his possession during the November 3, 2013 traffic stop and to suppress the statements he made to JPSO detectives while in custody following the stop.[3] The Court conducted an evidentiary hearing and heard oral argument on the motion on July 2, 2015. Burriss, JPSO Deputy Jean Cadet ("Cadet") and JPSO Detective Brad Roniger ("Roniger") testified. A summary of the officers' testimony follows.

**A. Testimony Adduced at the July 2, 2015 Hearing**

### 1. The Intercepted Phone Conversation

On November 3, 2013, Burriss was monitoring a wiretap on the phone of Robert Williams, the suspected leader of the Harvey Hustlers, a drug trafficking organization.[4] According to Burriss's testimony, Burriss heard a phone call between Williams and an unidentified individual.[5] Burriss believed that the individuals made a "credible threat of violence."[6] Burriss testified that he

---

[3] Rec. Doc. 46-1.

[4] Rec. Doc. 62 at 27–28.

[5] *Id.* at 28–30, 40.

[6] *Id.* at 28, 40.

interpreted the call to mean that Williams was giving the unidentified individual permission to kill an individual driving an Infiniti coupe, who Burriss believed was named "Tye" or "Todd."[7] Burriss testified that he believed Williams was instructing that the individual kill "Tye" or "Todd" if he was not outmanned and if there was not a police presence in the area.[8]

The FBI report summarizing the call states:

8:45 p.m.: Williams received an incoming call from telephone number [redacted]. The unidentified male talked to Williams briefly and then another unidentified male, referred to as "Minny" got on the line, with Williams. During the conversation between Williams and "Minny," "Minny" told Williams that "Tosh was in a silver coupe Infiniti near "Lambert" Street (Avondale, Louisiana). "Minny" asked Williams if they should "f[]" with it, to which Williams responded in the affirmative if there were not too many people around. Agents who reviewed the call believed that "Minny," with permission granted by Williams, was about to attempt to kill "Tosh."[9]

Burriss listened to the call several times to gather as much information as possible.[10] Burriss testified that he then contacted Brad Roniger, the case agent, who was a deputy with the Jefferson Parish Sheriff's Office and assigned to the FBI's Gang Task Force at that time.[11] Burriss told Roniger that the call referenced a "Lambert" Street near Glen Della Drive.[12] Roniger indicated that

---

[7] *Id.* at 29.

[8] *Id.* at 30–31.  More specifically, during the call, Williams instructed the individual to "mess with it" if "there aren't too many" and if the area was not "too hot."

[9] Rec. Doc. 49-1 at 1. Apparently this report was not created contemporaneously with the call, as Burriss testified he believed Williams was instructing that the individual kill "Tye" or "Todd," not "Tosh." However, this report uses the name "Tosh." Otherwise, there is a conflict in the testimony about the specific person for whom the officers were looking.

[10] Rec. Doc. 62 at 32.

[11] *Id.*

[12] *Id.* at 35.

the caller was likely referencing Layman Street.[13] Burriss testified that FBI protocol instructs that he call the case agents when he hears a threat of violence.[14]

Roniger testified that in 2013 he was assigned to the JPSO Gang Task Force, and he led the investigation of the Harvey Hustlers.[15] He identified Robert Williams as a leader of the Harvey Hustlers.[16] According to Roniger, on November 3, 2013, Burriss contacted Roniger to inform him that a credible threat had been made on the life of a person named "Tye" or "Tosh" driving a silver Infiniti coupe near Glen Della Drive and "Lambert" Street.[17] At the time of the call, Roniger was on uniformed detail in Metairie.[18] Roniger left the detail and traveled to the Westbank area.[19] Roniger could not recall his route of travel from Metairie to the Westbank on the night of November 3, 2013.[20] He believed that it took him approximately 15 minutes to get from Metairie to the Westbank.[21]

---

[13] *Id.* at 36.

[14] *Id.* at 37–38.

[15] *Id.* at 75.

[16] *Id.*

[17] *Id.* at 77.

[18] *Id.* at 78.

[19] *Id.*

[20] *Id.* at 103–04.

[21] *Id.* at 105.

### 2. Formulation of a "Plan"

Roniger testified that while he was driving to the Westbank area he requested assistance from the Third District patrol division.[22] In response to this request, Deputies Prudhomme, Cadet and Henry met him at a gas station on Highway 90.[23] Roniger informed the other officers that there was a credible threat on the life of the person driving a silver Infiniti coupe.[24] According to Roniger, during this meeting the officers "formulated a plan to enter the neighborhood and attempt to locate the subject whose life was being threatened."[25] Roniger testified that his goal was "[t]o locate the subject via his vehicle and warn him that his life was in danger and also to warn him that he should not frequent that neighborhood anymore due to the nature of the phone call."[26]

Roniger testified that he wanted to meet the deputies in person prior to beginning the search because he "wanted to be able to accurately relay the information to the patrol deputies, and [he] also wanted to come up with some sort of plan to approach this subject in a safe manner."[27] He denied that any part of the plan was to orchestrate a traffic stop.[28] He testified that his plan was "to identify the person . . . whose life had been threatened and to warn them of that threat."[29] He stated that he wanted to meet with the deputies face-to-face "to explain to them in simple terms that if we

---

[22] *Id.* at 78–79.

[23] *Id.* at 79.

[24] *Id.* at 84–85.

[25] *Id.* at 79.

[26] *Id.*

[27] *Id.* at 105.

[28] *Id.* at 106.

[29] *Id.* at 109.

did locate the subject and [he] was going to engage in a conversation with them, [he] wanted them to look the other way while [he] was doing it so nobody came up behind [them] and attempted to hurt Mr. Toussaint or myself while [they] were explaining it to him."[30] Roniger acknowledged that he knew from the wiretap that Williams told the individual not to shoot Toussaint if it was "too hot," meaning if police were around.[31]

Cadet testified that he is a patrol deputy for JPSO.[32] He participated in the arrest of Toussaint on November 3, 2013.[33] At that time, he was still in training as a road deputy.[34] Cadet testified that he and his partner, Deputy Henry, met Roniger at a truck stop on Highway 90 in Avondale.[35] On cross-examination, Cadet acknowledged that Deputy Prudhomme was also at the meeting.[36] Cadet testified that he was told that someone was trying to murder an individual driving a silver Infiniti coupe.[37] Cadet was instructed to drive around the Kennedy Heights neighborhood, and contact Roniger if he found the vehicle.[38]

---

[30] *Id.*

[31] *Id.* at 110.

[32] *Id.* at 42.

[33] *Id.* at 43.

[34] *Id.* at 56.

[35] *Id.* at 43.

[36] *Id.* at 57.

[37] *Id.* at 43–44.

[38] *Id.* at 44–45.

Cadet testified that the truck stop where he met Roniger was less than a few miles from Butler Street and Highway 90.[39] Prior to meeting Roniger, Cadet was conducting proactive patrols.[40] Cadet testified that he was not conducting proactive patrols when he began looking for the silver Infiniti coupe.[41] Conversely, Roniger testified that he was conducting proactive patrols on November 3, 2013, not that he was on the scene to intervene in a murder.[42] Roniger also acknowledged that his report states that the officers were conducting proactive patrols, and does not mention the threat to Toussaint's life.[43]

### 3. Patrol of the Kennedy Heights Neighborhood and the Alleged Traffic Violation

Following the meeting, Roniger entered Prudhomme's marked police vehicle.[44] Cadet and Henry were in a separate marked vehicle.[45] Roniger testified that he did not go to Layman Street during the November 3, 2013 patrol of the Kennedy Heights neighborhood.[46] Roniger could not recall the exact streets they patrolled that night.[47] Cadet also testified that he did not recall the streets he patrolled in the neighborhood.[48]

---

[39] *Id.* at 56–57.

[40] *Id.* at 57. Cadet testified that during a proactive patrol the police "make stops, make suspicious stops, suspicious persons." *Id.*

[41] *Id.* at 58.

[42] *Id.* at 99–100.

[43] *Id.* at 100.

[44] *Id.* at 79.

[45] *Id.*

[46] *Id.* at 114.

[47] *Id.*

[48] *Id.* at 60.

Cadet testified that his vehicle and Roniger's vehicle did not patrol the Kennedy Heights neighborhood together.[49] However, Cadet also testified that Roniger's vehicle was behind him when they spotted the silver Infiniti coupe.[50] He believed that Roniger's vehicle got behind him on Gambino Street.[51]

According to Cadet, he first observed a silver Infiniti coupe driving southbound on Glen Della Drive.[52] Cadet testified that the vehicle was going 35 miles per hour in a 20 miles per hour speed zone.[53] He stated that he made this determination by pacing the vehicle.[54] Cadet described the pacing process as follows: "we get behind the car, and we are doing approximately 35 miles an hour. And we couldn't keep up with the car, so that gave us the—pretty much the idea that 35 was over the speed limit."[55] Based upon this observation, Cadet elected to conduct a traffic stop.[56]

Cadet further testified that he first saw the silver Infiniti coupe on Glen Della Drive, but he could not recall where on Glen Della Drive he was when he saw the vehicle.[57] He testified that he was driving at a speed of 25 miles per hour when he saw the vehicle.[58] He sped up to 35 miles per

---

[49] *Id.* at 66.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 45.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 45–46.

[56] *Id.* at 46.

[57] *Id.* at 61–62.

[58] *Id.* at 62.

hour, but could not catch up with the vehicle.[59] Cadet could not recall the length of time that he paced the vehicle, but he believed it was for "maybe about a block or two."[60] He believed that Roniger may have been in the vehicle behind him, but he was not certain.[61] When asked to identify a photograph, Cadet could not identify the intersection of Glen Della Drive and Highway 90.[62]

After Cadet activated the police vehicle's overhead lights and sirens, the silver Infiniti coupe made a left turn from Glen Della Drive on to Highway 90, and immediately pulled over on the side of the road on Highway 90.[63]

Cadet testified that they were leaving the neighborhood when they saw the silver Infiniti coupe.[64] When asked why he decided to pace the vehicle instead of warning the driver that he was in danger of being killed, Cadet stated that "[t]he problem is we had been in the area for—I can't recall the amount of time. We saw a lot of silver Infinities that matched the car, and at that time we were just leaving the area."[65] He did not know why he decided to initiate a traffic stop instead of simply warning the driver that someone was trying to kill him.[66]

Roniger testified that they entered the Kennedy Heights neighborhood, and a "short time later [they] observed an Infiniti coupe heading southbound on Glen Della towards Highway 90 at

---

[59] *Id.*

[60] *Id.* at 62–63.

[61] *Id.* at 63.

[62] *Id.* at 63–64.

[63] *Id.* at 46, 48.

[64] *Id.* at 67.

[65] *Id.*

[66] *Id.* at 68.

a high rate of speed."[67] Cadet and Henry were in the police vehicle closer to the Infiniti coupe.[68] Roniger witnessed the Infiniti coupe turn left onto Highway 90, and "shortly thereafter Deputies Cadet and Henry initiated a traffic stop."[69] Roniger testified that he arrived at the scene "within seconds."[70]

Roniger stated that he first saw Toussaint's vehicle on Glen Della Drive.[71] Cadet's vehicle was "a ways in front of [Roniger's vehicle]."[72] He did not know how fast the vehicles were traveling.[73] Roniger only recalled seeing one silver Infiniti that night.[74] He believed that Glen Della Drive and Butler Street are approximately two to three blocks apart.[75]

Roniger testified that the speeding occurred while Toussaint was traveling southbound on Glen Della Drive toward Highway 90.[76] He acknowledged that his supplemental report states that the speeding occurred while Toussaint was traveling northbound on Glen Della Drive.[77] Roniger did

---

[67] *Id.* at 80.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 81.

[71] *Id.* at 114.

[72] *Id.*

[73] *Id.*

[74] *Id.* at 115.

[75] *Id.* at 116–17.

[76] *Id.* at 98.

[77] *Id.*

not include the information related to the wiretap in his supplemental report "to protect the integrity of the ongoing wiretap investigation."[78]

### 4. Events Following the Stop

According to Cadet, he approached the vehicle and advised the driver to step to the rear with his driver's license, registration and insurance.[79] Cadet testified that it was standard procedure to ask an individual to produce these documents during a traffic stop.[80] The driver, who was later identified as Toussaint, stepped to the rear of the vehicle without any documents.[81] Cadet testified that Roniger asked Toussaint where the documents were, and Toussaint fled.[82] Roniger tackled Toussaint; Cadet and Henry then assisted Roniger in handcuffing Toussaint.[83]

Roniger testified that he observed Cadet ask the driver to step to the rear of the vehicle with his license, vehicle registration and proof of insurance.[84] The driver, who was later identified as Toussaint, exited the vehicle without anything in his hands, and Roniger asked him where his documents were.[85] According to Roniger, if Toussaint would have exited the vehicle with his documents in hand, he would have immediately informed Toussaint of the threat against his life.[86]

---

[78] *Id.*

[79] *Id.* at 48–49.

[80] *Id.* at 55.

[81] *Id.* at 49.

[82] *Id.*

[83] *Id.* at 49–50.

[84] *Id.* at 82.

[85] *Id.*

[86] *Id.* at 102.

Because Toussaint exited the car without his documents, Roniger stated that he believed "the next logical question to ask [Toussaint] was 'Where is your driver's license.'"[87] Roniger testified that in his experience individuals are not always truthful about their identity.[88] Roniger indicated that it was his intention to look at Toussaint's driver's license to get his name.[89] Roniger did not tell Toussaint that his life could be in danger.[90] Roniger testified that Toussaint was stopped because he was observed committing a traffic violation.[91] He stated that he was not sure that the person who committed the traffic violation was the same individual whose life was threatened until after Toussaint was placed under arrest and provided his name.[92]

When Roniger asked Toussaint where his documents were, Toussaint then fled on foot.[93] Roniger chased after Toussaint.[94] He was able to grab Toussaint from behind and they both fell to the ground.[95] Roniger testified that he observed Toussaint reaching into his waistband.[96] Cadet

---

[87] *Id.*

[88] *Id.* at 103.

[89] *Id.* at 116.

[90] *Id.* at 83.

[91] *Id.* at 86.

[92] *Id.* at 86–87.

[93] *Id.* at 82.

[94] *Id.* at 85.

[95] *Id.*

[96] *Id.*

assisted Roniger in handcuffing Toussaint.[97] Cadet informed Roniger that he felt "a large hard object within the pants leg of Mr. Toussaint."[98] Roniger then advised Toussaint of his *Miranda* rights.[99]

Detective Anthony Buttone then arrived at the scene.[100] Buttone and Roniger searched Toussaint's person, and observed "a clear plastic bag containing off-white rocks."[101] Toussaint again attempted to flee on foot.[102] Buttone stopped Toussaint and completed the search incident to the arrest, recovering approximately 10 grams of off-white rocks, which tested positive for the presence of cocaine.[103] A search of Toussaint's car by a canine unit revealed no additional drugs or contraband.[104]

Cadet testified that after Toussaint was restrained, Cadet wrote the traffic citation.[105] Roniger testified that after the stop, Roniger gave Toussaint's name to Cadet, and Cadet used the information to perform a search and gather the identifying information necessary to complete the traffic ticket.[106] On the traffic ticket, Cadet listed the offense location as "Butler and US 90."[107] Cadet testified that

---

[97] *Id.* at 88.

[98] *Id.* at 89.

[99] *Id.* at 90.

[100] *Id.*

[101] *Id.* at 91.

[102] *Id.*

[103] *Id.*

[104] *Id.* at 92.

[105] *Id.* at 51–54.

[106] *Id.* at 69–70.

[107] *Id.* at 54; Rec. Doc. 46-6.

he listed this location on the ticket because during his police training he was instructed to list the nearest intersection, but the traffic offense occurred on Glen Della Drive not Butler.[108]

Deputies Cadet and Henry transported Toussaint to the JPSO investigations bureau, where Roniger conducted an interview with Toussaint.[109] Toussaint stated that he found the crack cocaine on the street.[110]  He also stated that "he traded a $50 piece of crack cocaine to a crackhead in Marrero in exchange for the firearm."[111] Roniger then advised Toussaint that there has been a credible threat on his life.[112]

Roniger testified that Cadet reported the traffic stop over the radio at 9:33 p.m.[113] The "108" officer in distress signal was reported at 9:35:03 p.m., when Toussaint began to flee.[114] At 9:36:43 p.m. the presence of a gun was reported.[115] At 9:36:59 p.m. the officers reported that the scene was secure.[116]

Roniger testified that if a traffic violation had not occurred, he would have:

more than likely let the situation dictate how [he] approached the subject. [He] would have more than likely followed him to a location, maybe a red light or a gas station or something, where [he]  could approach him, obtain some type of identification.

---

[108] Rec. Doc. 62 at 54–55.

[109] *Id.* at 93.

[110] *Id.*

[111] *Id.*

[112] *Id.* at 94.

[113] *Id.* at 96.

[114] *Id.* at 95–96.

[115] *Id.* at 96.

[116] *Id.*

And again, if it did turn out to be the person whose life we believed was in danger, [he] could explain the threat to them and properly warn them.[117]

If Toussaint had produced his driver's license during the stop, Roniger testified that he would have given Toussaint a traffic ticket and warned him that his life was in danger.[118] Roniger testified that he would expect a rival of Robert Williams to be capable of violence.[119]

## II. Parties' Arguments

### A. Toussaint's "Motion to Suppress Statement"

Toussaint urges the Court to suppress all evidence and statements obtained following the November 3, 2013 traffic stop at issue here.[120] In his motion, Toussaint asserts that he was not speeding or committing any other traffic violations.[121] He contends that "[t]he circumstances surrounding the traffic stop strongly suggest that the deputies did not have probable cause to conduct it."[122]

Toussaint asserts that "the transcript [of the intercepted phone call] is ambiguous and leaves itself open to various interpretations."[123] He contends that "the propriety of the stop must be called into question due to the errors and inconsistencies in the FBI report, the JPSO supplemental report, and the traffic citation."[124] He notes that the FBI report indicates that the stop occurred because

---

[117] *Id.* at 123.

[118] *Id.* at 124.

[119] *Id.* at 129.

[120] Rec. Doc. 46-1 at 1.

[121] *Id.*

[122] *Id.*

[123] Rec. Doc. 46-1 at 5; Rec. Doc. 46-8.

[124] Rec. Doc. 46-1 at 5.

Toussaint was believed to be in danger, while the JPSO supplemental report states that he was stopped while officers were conducting "pro-active patrols."[125] He asserts that these reports are undermined by the fact that he was stopped 45 minutes after the phone conversation was intercepted.[126]

Toussaint also notes a discrepancy between the supplemental report completed by the JPSO and the traffic ticket.[127] The supplemental report indicates that Toussaint was stopped while traveling northbound on Glen Della Drive,[128] while the traffic ticket states that the stop occurred at "Butler and US 90."[129] He asserts that Glen Della Drive intersects with U.S. 90 approximately half a mile west of the intersection with Butler Drive.[130]

Toussaint notes that there is no radar gun reading documenting his speed.[131] He contends that the supplemental report's statement that he was traveling "northbound" on Glen Della Drive is impossible because "one would have to travel southbound on Glen Della to approach the intersection with U.S. 90."[132] Further, he asserts that the traffic citation's statement that he was "paced" traveling at 35 miles per hour on Butler Drive is "virtually impossible" because "there is a stop sign at the corner of Dillard Drive and Butler," approximately five hundred feet north of the intersection of

---

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *Id.*; Rec. Doc. 46-5 at 4.

[129] Rec. Doc. 46-1 at 5; Rec. Doc. 46-6.

[130] *Id.* at 5–6.

[131] *Id.* at 6.

[132] *Id.*

Butler and U.S. 90 and a second stop sign "two-tenths of a mile north of the intersection of Southern and Butler."[133] He notes that the ticket does not mention any running of a stop sign.[134]

Toussaint contends that the recording of conversations between the JPSO deputies and dispatch calls the account of the stop into further question.[135] He asserts:

> If the supplemental report is to be fully believed, officers would have had to conduct a traffic stop, order Mr. Toussaint to the rear of his car, ask him a second time for identification, order him to stop fleeing numerous times, catch him from behind, deliver diversionary strikes to his back, forcefully remove his hands from underneath his body, handcuff him, and read him Miranda rights in a time period of approximately forty five seconds. One would have to suspend any premise of disbelief to accept that these events took place in a forty five second interval.[136]

He contends that "[o]ther courts, when faced with similar factual situations, have noted that inconsistencies similar to those in this case can have a serious impact on the issues of reliability and credibility."[137] Toussaint relies on a District of Maryland case, where the court found insufficient evidence to establish probable cause for the traffic stop, reasoning that there were "serious inconsistencies in the record as to facts as fundamental as the time and location of the stop."[138] He also relies on a Western District of Pennsylvania case, where the Court held that the Government had not proven by preponderance that the defendant ran a red light due to inconsistencies in

---

[133] *Id.*

[134] *Id.* at 6–7.

[135] *Id.* at 7.

[136] *Id.* at 8.

[137] *Id.* at 8–9 (citing *United States v. Burke*, 605 F.Supp.2d 688 (D. Md. 2009); *United States v. Murphy*, 402 F.Supp.2d 561, 569-70 (W.D.Pa. 2005); *United States v. Means*, 351 F.Supp.2d 852, 854–55 (E.D.Wis.2004)).

[138] *Id.* at 8 (citing *Burke*, 605 F.Supp.2d at 696).

testimony and the arrest report issued in conjunction with the stop.[139] He argues that there is reason to question the credibility of the arresting officers in this case, as they were looking for a particular vehicle and were not on routine patrol.[140] He states, "[t]he circumstances surrounding Mr. Toussaint's arrest suggest that JPSO officers were determined to pull over Mr. Toussaint and detain him, regardless of the constitutional issues involved. The officers did not have probable cause to conduct the stop."[141] Accordingly, he urges the Court to exclude the cocaine and firearm seized as a result of the stop.[142]

Toussaint also urges the Court to suppress the statements he made to JPSO detectives under the "fruit of the poisonous tree" doctrine.[143] He asserts that "the police report suggests that the illegal traffic stop and the incriminating statements were close in temporal proximity."[144] He avers that "[t]here were no material intervening circumstances present between the time of the traffic stop and the subsequent transportation and incriminating statements."[145] Further, he argues that "the inculpatory statements would not have been obtained but for the evidence seized in the events following the illegal traffic stop."[146]

---

[139] *Id.* (citing *Murphy*, 402 F.Supp.2d at 569–70).

[140] *Id.* at 9.

[141] *Id.*

[142] *Id.*

[143] *Id.* at 9–10.

[144] *Id.* at 10.

[145] *Id.*

[146] *Id.* (citing *United States. v. Hernandez*, 279 F.3d 302, 309 (5th Cir. 2002)).

*B. The Government's Opposition*

The Government urges the Court to deny the motion, arguing that the evidence and statements were constitutionally obtained.[147] It asserts that "law enforcement officers had a moral, ethical, and professional duty to stop Tosh Toussaint and warn him of a highly credible threat to his life."[148] It argues that "[i]n the event that a monitoring agent intercepts a call or conversation relating to possible violence of any person, the agent has a duty to assess the magnitude and immediacy of the potential violence as well as the appropriate response."[149] It contends that "the agents who reviewed the call believed that Toussaint was the target of an approved and imminent murder."[150] The Government relies on *Warden, Md. Penitentiary v. Hayden*, arguing that "the Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."[151] It argues that exigent circumstances include threats to the safety of law enforcement officers or the general public.[152] Here, the Government contends that the death threat justified the stop because the exigent circumstances presented a danger to both Toussaint and the general public.[153]

---

[147] Rec. Doc. 49 at 1.

[148] *Id.* at 6.

[149] *Id.* at 6–7.

[150] *Id.* at 7.

[151] *Id.* at 7 (citing 387 U.S. 294, 298–99 (1967)).

[152] *Id.* (citing *Hayden*, 387 U.S. at 298–99).

[153] *Id.*

Further, the Government argues that Toussaint was speeding in a residential neighborhood.[154] It asserts that this traffic violation "provided another basis for probable cause to stop the defendant."[155] Accordingly, the Government contends that the traffic stop was reasonable.[156]

### C. The Government's Supplemental Opposition

On July 9, 2015, the Government filed a supplemental opposition to Toussaint's motion.[157] The Government asserts that "[b]ecause the evidence received at the July 2, 2015 evidentiary hearing establishes two independent grounds for why the stop that led to the seizure of the weapon and drugs was reasonable within the meaning of the Fourth Amendment, defendant's motion to suppress should be denied."[158] The Government notes that:

> To deny the defendant's motion to suppress, the Court has to find one of the following things to be true. First, it was reasonable for police to initiate an encounter with the defendant in light of the threat that had been recently made against him. Alternatively, Toussaint committed a traffic offense that justified law enforcement making a stop on the defendant.[159]

The Government asserts that exigent circumstances made the stop "reasonable" within the meaning of the Fourth Amendment.[160] It contends that "[a] violent gangster approved a proposed attack on Tosh Toussaint by an unknown party," and "[t]his exigency still existed approximately forty-five minutes after the attack was condoned when law enforcement came into contact with

---

[154] *Id.* at 8.

[155] *Id.* (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

[156] *Id.*

[157] Rec. Doc. 63.

[158] *Id.* at 1.

[159] *Id.* at 8.

[160] *Id.* at 9.

Toussaint."[161] It argues that the police stop here was "significantly less intrusive than entering a home without a warrant," conduct that the Supreme Court found reasonable in *Brigham City, Utah v. Stuart*.[162] Additionally, the Government asserts that "even if some portion of the desire to locate Toussaint was to conduct an investigation . . . the Court should conclude that the stop was reasonable so long as the Court finds that the officers' conclusion that Toussaint's life was in danger was objectively reasonable."[163] Applying a totality of the circumstances test, the Government contends that the officers were reasonable in stopping the silver coupe because: (1) the officer's interpretation that the wiretap call conveyed a threat was reasonable; and (2) the efforts to locate the vehicle were reasonable.[164] The Government argues that the Court should not find the officers' actions unreasonable based upon a determination that "another plan in hindsight might have worked better or faster."[165]

The Government also asserts that the speeding violation created reasonable suspicion for the stop.[166] The Government contends that pacing is an acceptable method for determining a driver's speed.[167] It relies on Deputy Cadet's testimony that "he was travelling 20 or 25 miles per hour, observed the defendant's vehicle, accelerated to catch up to the defendant, paced him at 35 miles

---

[161] *Id.*

[162] *Id.* at 9–10 (citing 547 U.S. 398 (2006)).

[163] *Id.* at 10–11.

[164] *Id.* at 11.

[165] *Id.* at 11.

[166] *Id.* at 12.

[167] *Id.* (citing *State v. Archuleta*, 463 F. App'x 412, 416-18 (5th Cir. 2012); *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999)).

per hour, and observed the coupe continue to pull away."[168] The Government asserts that, given those facts, it was reasonable to conclude that the vehicle was speeding.[169] "Because the Supreme Court has also endorsed the use of pretextual stops by law enforcement," the Government contends that "the officers' subject [sic] intent in conducting the stop was irrelevant."[170] Accordingly, the Government argues that the stop was reasonable "[s]o long as the Court credits Deputy Cadet's testimony that he observed the coupe speeding."[171]

The Government argues that the officers acted appropriately when they asked Toussaint to exit the vehicle and present his driver's license, insurance and registration.[172] The Government asserts that "[b]y ordering Toussaint out of the car immediately upon approach, Deputy Cadet did nothing more than follow a bright-line rule laid down by the Supreme Court and taught to police officers across the country."[173]

Finally, the Government asserts that "[t]he clerical errors in the police paperwork do not undermine the credibility of the officers sufficient to call into question the basis for the stop."[174] The Government argues that this case is distinguishable from *United States v. Burke*, relied on by Toussaint, because unlike the officer in *Burke*, Deputy Cadet testified to the specific facts supporting

---

[168] *Id.*

[169] *Id.*

[170] *Id.* at 13 (citing *Whren v. United States*, 517 U.S. 806 (1996)).

[171] *Id.* at 14.

[172] *Id.* (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Maryland v. Wilson*, 519 U.S. 408 (1997); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 761 (5th Cir. 1999); *United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993)).

[173] *Id.* at 15 (citing *Maryland v. Wilson*, 519 U.S. 408 (1997)).

[174] *Id.*

the conclusion that the car was speeding.[175] It also contends that this case is distinguishable from *United States v. Murphy*, another case relied on by Toussaint, because "[t]he minor inconsistencies in this case do not rise to the level of factual uncertainty that existed in *Murphy*, as the report and ticket in this matter clearly indicate that defendant was speeding[,] and that was a reason why he was stopped."[176]

### D. Toussaint's Reply to the Government's Supplemental Opposition

On July 16, 2015, Toussaint filed a reply to the Government's supplemental opposition.[177] He asserts that "[t]he story woven by the [G]overnment at the hearing on the motion to suppress and in brief lacks any modicum of common sense."[178] Toussaint raises the following questions, which he asserts were either unanswered or unsatisfactorily answered at the hearing:

> [W]hy did the police endanger Mr. Toussaint's life by taking so long to get to Kennedy Heights? Why did nobody call 911 prior to beginning the search? Why did nobody call ahead on the radio? Why did law enforcement waste time meeting at a gas station before proceeding to Kennedy Heights? Why was a face-to-face meeting necessary? Why did the officers not simply ask Mr. Toussaint his name when he could not produce a driver's license? Why is there no indication that law enforcement warned Mr. Toussaint of the supposed danger to his life until after he was arrested?[179]

---

[175] *Id.* at 16–17 (citing 605 F.Supp.2d 688 (D. Md. 2009)).

[176] *Id.* at 18 (citing 402 F.Supp.2d 561 (W.D. Pa. 2005)).

[177] Rec. Doc. 64.

[178] *Id.* at 1.

[179] *Id.* at 2.

Toussaint asserts that the JPSO officers' response to the threat calls into question the officers' credibility.[180] He asserts that the law enforcement personnel were motivated by a desire to further the Harvey Hustlers investigation.[181]

Toussaint contends that "[t]he evidence presented at the hearing on the motion to suppress does not support a finding that an exigency existed at the time of the stop or a finding that officers had a valid basis for stopping Mr. Toussaint."[182] He asserts that "the officers' credibility is damaged due to the numerous inaccuracies made in the paperwork evidencing the traffic stop."[183]

Toussaint argues that the Government cannot meet its burden of proving that exigent circumstances existed at the time of the stop.[184] He asserts that the Fifth Circuit often refers to the following non-exhaustive list of factors, referred to as the *Rico* factors, in determining whether exigency exists.[185] Toussaint contends that most of the *Rico* factors weigh in favor of a finding that no exigency existed at the time of the stop because: (1) the officer's conduct did not demonstrate urgency; (2) the officers did not know whether Toussaint was carrying contraband or weapons; (3) the caller was in the Kennedy Heights neighborhood at the time of the threat; and (4) it would have

---

[180] *Id.*

[181] *Id.*

[182] *Id.* at 6.

[183] *Id.*

[184] *Id.*

[185] *Id.* at 7 (citing *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995)). The *Rico* factors are: (1) the degree of urgency involved and amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics trafficking.

taken the caller less than 45 minutes to kill Toussaint.[186] He concedes that the potential danger to the police is the only factor weighing in favor of denying the motion to suppress.[187] However, he asserts that there should have been no danger to the police because the call specifically mentioned not to harm the occupant of the silver Infiniti coupe if the police were present.[188]

Toussaint argues that the 45 to 50 minute time period between the call and the stop "work against the government's position" because the case law suggests that "a time period of seconds to several minutes is not enough time for the exigency to dissipate, while a longer time period is sufficient time."[189] He contends that the Government's position "is further damaged by the officers' actions after Mr. Toussaint pulled to the side of US 90."[190]   "If the officers' principal motivation was to 'protect and warn,'" Toussaint asserts that their immediate reaction after encountering him should have been to warn him of the threat.[191] Toussaint argues that the holding of *Brigham City v. Stuart*, relied on by the Government, is not controlling here because it deals with the entry of police onto a private residence, and the officers in that case conducted their entry immediately, rather than waiting more than 45 minutes.[192] "From a purely objective viewpoint," Toussaint asserts that the

---

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] *Id.* at 8 (citing *United States v. Johnson*, 357 F. App'x 29 (9th Cir. 2009); *United States v. Fleming*, 677 F.2d 602, 607 (7th Cir.1982; *United States v. Davis*, 423 F.2d 974 (5th Cir. 1970)).

[190] *Id.*

[191] *Id.*

[192] *Id.* at 9.

conduct of Roniger and Burriss suggests "that something else besides concern for human life was motivating them."[193]

As to the alleged traffic violation, Toussaint contends that the Government cannot meet its burden of proving that he committed a traffic violation.[194] He asserts that the traffic stop was not justified at its inception because Cadet did not have an objectively reasonable basis for concluding that a traffic violation occurred.[195] Toussaint notes that Cadet testified that he was driving at approximately 25 miles per hour when he saw the Infiniti coupe on Glen Della Drive, and Cadet further testified that he sped up and paced Toussaint at 35 miles per hour.[196] He notes that Cadet could not recall any other critical details of the alleged speeding infraction including: (1) the distance between Cadet's police unit and Toussaint when he began pacing; (2) the time that elapsed between the pacing and the traffic stop; (3) the location on Glen Della Drive where Cadet began pacing Toussaint; (4) where Toussaint turned onto Glen Della Drive; and (5) the distance traveled while pacing.[197]

Toussaint asserts that the Government is essentially urging the Court to "trust" the officers' statements.[198] Toussaint notes that the stop occurred at 9:30 p.m. in November, it was very dark outside and Cadet's "visual cues were presumably reduced to a pair of taillights on the rear of a

---

[193] *Id.* at 10.

[194] *Id.*

[195] *Id.* at 11.

[196] *Id.*

[197] *Id.*

[198] *Id.* at 12.

small silver Infiniti coupe."[199] He contends that "[i]t is completely implausible that Deputy Cadet was able to locate a silver Infiniti ahead of him, take note of the speed that he was driving, accelerate to 35 miles per hour, observe Mr. Toussaint's vehicle for a second time, take note of his own speed for a second time, begin the process of initiating the traffic stop, and speed up to catch Mr. Toussaint on a street the length of Glen Della [Drive]."[200] He contends that most pacing cases involve travel on major highways, because "it is infinitely easier and more practical to pace another vehicle on a long, unobstructed road."[201]

Toussaint contends that the inaccuracies on the traffic citation further weaken the Government's position.[202] He notes that Cadet relied on the fact that he was still in training in November 2013.[203] He contends that "if the Court accepts Deputy Cadet's 'officer in training' excuse for the inaccuracy on the citation, it should apply the same rationale to his testimony regarding pacing."[204]

Toussaint also points to the following inaccuracies in Roniger's supplemental report: (1) the report incorrectly states that officers were traveling northbound on Glen Della Drive before stopping Toussaint; (2) the report states that Roniger was on a "proactive patrol" at the time of the stop; and (3) the report states that the posted speed limit on Glen Della Drive was 25 miles per hour.[205]

---

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] *Id.* at 13.

Toussaint cites three district court cases, arguing that "when considered together," the cases "stand for the proposition that factual inconsistencies in documentation or testimony on the part of law enforcement can have a significant impact on the trier of fact's consideration of reliability and credibility."[206]

### III. Law and Analysis

#### A. Emergency Aid Exception

##### 1. Applicable Law

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." However, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."[207] The vast majority of "emergency aid" cases arise in the context of warrantless entries into a home.[208] Under the "emergency aid" exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[209] The emergency aid exception "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises."[210] "It requires only 'an objectively reasonable basis for

---

[206] *Id.* at 14–15 (citing *United States v. Burke*, 605 F.Supp.2d 688 (D. Md. 2009); *United States v. Murphy*, 402 F.Supp.2d 561 (W.D. Pa. 2005); *United States v. Morse*, 2008 WL 1751382 (E.D. Wis. 2008)).

[207] *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99 (1967).

[208] *See, e.g., Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011*); Michigan v. Fisher*, 558 U.S. 45, 47 (2009)*; Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008); *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007); *United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005).

[209] *King*, 131 S.Ct. at 1856 (citing *Brigham City*, 547 U.S. at 403).

[210] *Fisher*, 558 U.S. at 47 (citing *Brigham City*, 547 U.S. at 404–05).

28

believing,' that 'a person . . . is in need of immediate aid.'"[211] "The Supreme Court has long held that

the 'touchstone of Fourth Amendment analysis is reasonableness.'"[212] "Reasonableness, measured

'in objective terms by examining the totality of the circumstances,' 'eschew[s] bright-line rules,

instead emphasizing the fact-specific nature of the . . . inquiry.'"[213] "While avoiding the risk of

second-guessing officers' actions based on 20/20 hindsight, [the Court] must still ensure that, at the

time the officer acted, there was reliable information of an 'urgent, ongoing emergency.'"[214]

"Because it is essentially a factual determination, there is no set formula for determining when

exigent circumstances may justify a warrantless entry."[215] The Government bears the burden of

demonstrating exigent circumstances by a preponderance of the evidence.[216]

In *Brigham City v. Stuart*, a lead case decided by the United States Supreme Court on the

emergency aid exception, police officers responded to a complaint regarding a loud party at a

residence.[217] Upon arriving at the house, the police saw juveniles drinking beer in the backyard.[218]

Through a screen door, the police could see a fight occurring in the kitchen of the home, and they

observed a victim of the fight spitting blood into a nearby sink.[219] The police then opened the door

---

[211] *Id.* (internal citations omitted).

[212] *United States v. Brigham*, 382 F.3d 500, 507 (2004) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

[213] *Id.* (quoting *Robinette*, 519 U.S. at 39).

[214] *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1132 (5th Cir. 2014) (quoting *United States v. Timmann*, 741 F.3d 1170, 1180–81 (11th Cir. 2013)).

[215] *Troop*, 514 F.3d at 409 (citing *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001)).

[216] *Id.* (citing *Gomez-Moreno*, 479 F.3d at 354).

[217] *Brigham City*, 547 U.S. at 400–01.

[218] *Id.* at 401.

[219] *Id.*

and announced their presence.[220] The trial court suppressed the evidence obtained after the officers entered the home.[221] The United States Supreme Court reversed the trial court's determination, holding that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[222] The Supreme Court rejected the defendants' assertions that the Court should consider the subjective motives of the officers and the fact that "the officers were more interested in making arrests than quelling violence."[223] The Court found that "[a]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action."[224] The Court also found that the police officer's manner of entry was reasonable where an officer opened the screen door and "yelled in[,] police," and, after no response, the officer "stepped into the kitchen and announced himself again."[225]

Toussaint urges the Court to apply the *Rico* factors, which are factors relied upon by the Fifth Circuit to justify warrantless entry in cases where the potential destruction of evidence constitutes exigent circumstances.[226] However, in recent cases where the exigent circumstances at issue

---

[220] *Id.* at 403.

[221] *Id.*

[222] *Id.* (internal citations omitted).

[223] *Id.* at 404.

[224] *Id.* (internal citations and quotation marks omitted).

[225] *Id.* at 406.

[226] *See United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995)). The *Rico* factors are: (1) the degree of urgency involved and amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics trafficking.

involved the need to render emergency aid, the Fifth Circuit has not applied these factors, which are tailored to cases where the potential destruction of evidence constitutes exigent circumstances, but rather has looked to whether the totality of the circumstances, viewed objectively, justify the action.[227] Here, the exigency involves the need to render emergency aid, not the need to prevent the destruction of evidence, and so the Court finds that the application of the *Rico* factors is inappropriate in this case. The Court finds the following three cases, decided by the United States Fifth Circuit Court of Appeals, instructive on where courts should apply the emergency aid exception.

In *United States v. Troop*, an emergency aid case decided by the Fifth Circuit in 2008, border patrol agents witnessed a vehicle dropping off several individuals at a location known to be used by alien smugglers.[228] The agents found footprints at the location, and tracked those footprints for four or five miles to a home.[229] An agent testified that as they followed the tracks, "the footprints became scuffed and had less pronounced toe indentations than at first, which indicated that the individuals were fatigued."[230] Through a window, the agents could see two men lying on a bed; the agents called to these men, receiving no response.[231] The agents then entered the home without a warrant.[232] "As evidence that the aliens may have been in physical distress, the Government point[ed] to the high temperatures that night, the evidence that the suspected aliens were fatigued, and the failure of

---

[227] *See, e.g., Troop*, 514 F.3d at 409.

[228] *Troop*, 514 F.3d at 409.

[229] *Id.*

[230] *Id.*

[231] *Id.* at 408.

[232] *Id.*

anyone inside [the] house to respond when the agents knocked on the door and window."[233] The court found that "there was no evidence of medical distress requiring *immediate aid*, such as loss of blood, signs of physical illness, or evidence that an individual had to be carried or dragged."[234] Absent any such evidence, the court found that "it was unreasonable for agents to conclude that the suspected aliens likely needed immediate aid based solely on the fact that the aliens showed fatigue."[235] Accordingly, the Fifth Circuit concluded that the district court erred in denying the defendant's motion to suppress.[236]

Conversely, in *United States v. De Jesus-Batres*, the Fifth Circuit found that the district court did not clearly err in finding that exigent circumstances existed under the facts of the case.[237] There, the officers went to a house following reports from an individual that he had been held hostage and several others were still being held by an unknown number of captors.[238] "After releasing the three remaining aliens from the house and searching the house and attic, [the police officer] searched the garage because he did not know if additional aliens or suspects were hiding there."[239] Under these circumstances, the Fifth Circuit found "the delay of approximately 45 minutes before the officers entered the garage does not by itself preclude a finding of exigent circumstances."[240]

---

[233] *Id.* at 409.

[234] *Id.* (emphasis added).

[235] *Id.*

[236] *Id.*

[237] *De Jesus-Batres*, 410 F.3d at 159.

[238] *Id.*

[239] *Id.*

[240] *Id.*

In *United States v. Davis*, the Fifth Circuit held that an "emergency situation cannot be relied on to justify a search occurring three and one-half hours after the emergency ended."[241] There, the police went to the home of Houston Davis with an arrest warrant for both Houston Davis and his father, Felder Davis.[242] When Felder Davis learned that he was being placed under arrest, he fled to his home, which was located nearby and retrieved a firearm.[243] During the confrontation, Houston Davis was shot and severely wounded.[244] Felder Davis then disposed of the firearm and surrendered to the police.[245] Approximately three and one-half hours later, the police returned to Felder Davis's home to search for the firearm.[246] The Fifth Circuit found that the injury to Houston Davis "created a crisis demanding the agents' immediate attention."[247] However, the court found that "the emergency ceased to exist when the ambulance [taking the injured suspect to the hospital] departed.[248] Accordingly, the Court held that the emergency did not justify the search.[249]

---

[241] *United States v. Davis*, 423 F.2d 974, 980 (1970).

[242] *Id.* at 976.

[243] *Id.*

[244] *Id.*

[245] *Id.*

[246] *Id.*

[247] *Id.*

[248] *Id.* at 980.

[249] *Id.*

*2. Analysis*

   *a. Was the Interpretation of the Wiretap Reasonable?*

Here, the Government first contends that the officers were reasonable in stopping the silver Infiniti coupe pursuant to the emergency aid exception because the officers reasonably interpreted the wiretap call to convey a threat. Toussaint claims that the information received on the wiretap was ambiguous, leaving itself open to various interpretations.

As discussed above, under the emergency aid exception, officers may intervene where they have an objectively reasonable basis for believing that a person is in need of immediate aid.[250] The determination of whether an action is reasonable is a fact-specific inquiry "measured in objective terms by examining the totality of the circumstances."[251] The Court must "ensure that, at the time the officer acted, there was reliable information of an 'urgent, ongoing emergency.'"[252]

Based on the testimony and evidence presented, the Court finds that Burriss's interpretation of the wiretap call was reasonable. Burriss credibly testified that he interpreted the wiretap phone call to mean that Williams was giving an unidentified individual permission to kill an individual driving an Infiniti coupe. The Government also introduced a recorded copy of the phone call at the hearing. Based on the testimony of Burriss and the Court's own review of the intercepted phone call, the Court finds that at the time of the phone call there was reliable information of an urgent, ongoing emergency. Accordingly, the Court finds that the Government has met its burden of showing by a preponderance of the evidence that exigent circumstances existed at the time the wiretap call was

---

[250] *Fisher*, 558 U.S. at 47 (citing *Brigham City*, 547 U.S. at 404–05).

[251] *Brigham*, 382 F.3d at 507 (quoting *Robinette*, 519 U.S. at 39).

[252] *Rice*, 770 F.3d at 1132 (quoting *Timmann*, 741 F.3d at 1180–81).

intercepted. However, that finding alone does not justify the stop of Toussaint's vehicle. The Court must also determine whether the response to the perceived threat and the decision to stop Toussaint were reasonable.

### b. Were the Response to the Perceived Threat and the Decision to Stop Toussaint Reasonable?

The Government contends that the response to the perceived threat was reasonable because the officers' efforts to locate the vehicle were reasonable. Conversely, Toussaint asserts that even if an exigency existed at the time Burriss intercepted the wiretap phone call, the exigency had dissipated by the time the officers stopped Toussaint's vehicle.

There is no bright line rule for the length of time that exigency exists, but a response to exigent circumstances must be reasonable under the circumstances. For example, in *Brigham City*, the Supreme Court found that the officers' manner of entry into a home where exigent circumstances existed was reasonable under the circumstances.[253] In *United States v. Davis*, the Fifth Circuit held that an emergency situation did not justify a search occurring three and one-half hours after the emergency had ended.[254] As demonstrated by these cases, a police officer's response to exigent circumstances must be reasonable, and exigent circumstances cannot justify a stop after the emergency has ended.

Here, the officers did not arrive at the scene or conduct their patrol of the neighborhood with any sense of urgency. After receiving information of the threat from Burriss, Roniger drove at least 15 minutes from a school in Metairie to the Westbank. Instead of radioing ahead to have patrol

---

[253] *Brigham City*, 547 U.S. at 406. (finding that the police officer's manner of entry was reasonable where an officer opened the screen door and "yelled in police," and, after no response, the officer "stepped into the kitchen and announced himself again.").

[254] *Davis*, 423 F.2d  at 980.

deputies begin searching for the silver Infiniti coupe, Roniger had the deputies meet him at a truck stop. Roniger testified that he wanted to meet the deputies in person to devise a "plan" on how to approach the subject in a safe manner. Indeed, an essential element of exigency and the need for this exception is that there is no time to plan—or get a warrant.

When questioned about the "plan," Roniger testified that the plan was "to identify the person . . . whose life had been threatened and to warn them of that threat." When questioned regarding why he felt the need to take the time to conduct a face-to-face meeting, Roniger stated that he wanted "to explain to [the deputies] in simple terms that if we did locate the subject and [he] was going to engage in a conversation with them, [he] wanted them to look the other way while [he] was doing it so nobody came up behind [them] and attempted to hurt Mr. Toussaint or myself while [they] were explaining it to him." Roniger did not provide any explanation as to why this information could not be communicated over the radio.

In most cases where exigency has been found, the response to the situation has been immediate. In *United States v. De Jesus-Batres*, where it took the officers 45 minutes to search the garage, after searching the house and the attic, the delay in getting to the garage to search for hostages seems reasonable because the officers just happened to reach the garage last. There was no indication that the officers did not respond immediately to this emergency. In this case, the time delay between Roniger's receipt of the call and the stop calls into question the exigency of the circumstances, as the response was extended. As previously noted, for the emergency aid exception, the Court must find that "at the time the officer acted, there was reliable information of an 'urgent, ongoing emergency.'"[255] Roniger's response undermines such a finding because he did not act with

---

[255] *Rice*, 770 F.3d at 1132 (quoting *Timmann*, 741 F.3d at 1180–81).

a sense of urgency by not beginning the search for the vehicle immediately, delaying the search until he could be present and conducting a meeting before beginning the search.

The actions and testimony of Cadet demonstrate that the officers did not reasonably believe that a person was in need of *immediate aid* at the time of the stop. Cadet testified that when he met Roniger at the truck stop, he was instructed to drive around the Kennedy Heights neighborhood, and contact Roniger if he found the vehicle. Presumably, the patrolling officers, now on alert that a murder could take place, would have monitored any cars following or trailing other vehicles in a suspicious manner. Moreover, when Cadet actually came into contact with the vehicle, instead of immediately contacting Roniger or warning Toussaint of the threat, Cadet began to "pace" Toussaint's vehicle in an effort to determine whether Toussaint was speeding. When asked why he decided to pace the vehicle instead of warning the driver that he was in danger of being killed, Cadet stated that "[t]he problem is we had been in the area for—I can't recall the amount of time. We saw a lot of silver Infinities that matched the car, and at that time we were just leaving the area." Cadet testified that he saw other silver Infinities in the area, but it does not appear from his testimony that he took any action after seeing those other vehicles.

According to Cadet's own testimony, he observed Toussaint's car as he was leaving the neighborhood, and over 45 minutes[256] had elapsed since the credible threat was made against the driver of the silver Infiniti coupe. Importantly, there is no evidence of continued threats on the wiretap, gunfire in the neighborhood, or any reports of activity in the neighborhood indicating that the individuals on the wiretap were following through with the perceived threat. Cadet did not testify

---

[256] After Burriss first heard the call, he testified that he listened to the call several times to gather as much information as possible. Burriss then contacted Roniger, who testified that it took him approximately 15 minutes to get from Metairie to the truck stop on the Westbank. The officers then met at the truck stop before even beginning to patrol the neighborhood.

that anyone was chasing or firing at the vehicle at the time he spotted it. Further, Roniger testified he did not patrol Layman Street, the street  referenced in the wiretap call and where the exigent circumstances were believed to be occurring. It appears from the evidence and testimony that whatever exigency existed at the time of the wiretap call had clearly subsided and, therefore, when Cadet started pacing Toussaint's vehicle, he was not acting in response to exigent circumstances.

Roniger testified that he was performing proactive patrols on the night of November 3, 2013. Both Roniger and Cadet testified that Toussaint was stopped because he was observed committing a traffic violation. Roniger stated that he was not even sure that the person who committed the traffic violation was the same individual whose life was threatened until after Toussaint was placed under arrest and provided his name. Based on the officers' own testimony, at the point when the officers decided to pace Toussaint and make a traffic stop, the officers had no way of knowing if the driver was the same individual who was in danger. Clearly the exigency was over. At the time of the stop, there was no reliable information of an urgent, ongoing emergency. Accordingly, the Court finds that based on the testimony and evidence presented at the July 2, 2015 hearing, when Toussaint was stopped on November 3, 2013 at 9:33 p.m., the exigent circumstances no longer existed and the decision to stop Toussaint on that basis was not objectively reasonable.

### 3. Conclusion

For the foregoing reasons, after assessing the evidence and credibility of the witnesses at the hearing, the Court finds that the officers' initial decision to act on the perceived threat heard over the wiretap was reasonable. However, the Court finds that the response to the perceived threat and the decision to stop Toussaint were not reasonable. The Government has not demonstrated that the exigency was existing or still imminent at the time Toussaint was stopped. The officers did not

arrive at the scene or conduct their patrol of the neighborhood with any sense of urgency.  Both the officers and Toussaint were leaving the area where the threat originated when he was stopped, and there is no evidence that anyone other than the officers were following Toussaint. More than 45 minutes had passed since the threat was made. Instead of stopping Toussaint to warn him of the threat, the officers elected to conduct a routine traffic stop. Had the officers only stopped Toussaint to warn him of a credible threat, Toussaint should have been free to leave, and the officers would not have had any reason to chase Toussaint when he decided to flee. Accordingly, the Court finds that the Government has not met its burden of showing that exigent circumstances still existed at the time of the stop sufficient to justify the stop and subsequent search and seizure.

## B. Traffic Stop

### 1. Applicable Law

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."[257] Accordingly, an automobile stop must be reasonable under the circumstances.[258] In determining whether a traffic stop is reasonable under the Fourth Amendment, courts apply the two-step inquiry set forth by the Supreme Court in *Terry v. Ohio*.[259] First, the Court must determine "whether the officer's actions of stopping the vehicle was justified at its inception."[260] Applying this step, the Court must find that the police officer had "an objectively

---

[257] *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

[258] *Id.* at 810.

[259] 392 U.S. 1 (1968).

[260] *United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007).

reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."[261] Second, the Court must decide whether "the officer's actions were reasonably related in scope to the circumstances that justified that stop."[262]

The Fifth Circuit has stated that "[t]his rule provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justification for their actions."[263] However, "the legal justification must be objectively grounded."[264] "Where the supposed traffic infraction that formed the basis for a vehicular stop in fact was not a violation of state law, there [is] no objective basis for probable cause justifying the stop."[265] "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion."[266] The Government "bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional."[267]

Here, Cadet testified that he paced the vehicle to determine whether the driver was speeding. In *United States v. Castro*, the Fifth Circuit approved the law enforcement technique of "pacing" a vehicle to determine whether it was speeding.[268] There, police officers were conducting

---

[261] *United States v. Banuelos–Romero*, 597 F.3d 763, 766 (5th Cir. 2010) (internal quotation marks and citation omitted).

[262] *Stevens*, 487 F.3d at 244.

[263] *See United States v. Lopez–Valdez*, 178 F.3d 282, 288 (5th Cir. 1999).

[264] *Id.*

[265] *Id.*

[266] *Segura v. United States*, 468 U.S. 796, 804 (1984).

[267] *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)

[268] 166 F.3d 728 (5th Cir. 1999).

surveillance of a suspected narcotics trafficker.[269] One of the officers followed the vehicle driven by one of the defendants for several miles on a highway, and the officer testified that he "paced" the vehicle at 67 miles per hour in a 55 miles per hour zone.[270] At the suppression hearing, the district court also heard testimony from the defendants that their car's speedometer did not register that they were speeding.[271] The district court "expressly found that the [defendants' car] was in fact speeding" by crediting the officer's testimony over that of the defendants.[272] On appeal, the Fifth Circuit concluded that "[o]n the record of this case, [it was] not prepared to say that the district court's credibility determinations and ensuing factual findings were clearly erroneous."[273] Because there was no reasonable basis for challenging the district court's finding that the vehicle was speeding, the Fifth Circuit concluded that the police officer had reasonable suspicion to stop the vehicle.[274]

In *United States v. Archuleta*, the Fifth Circuit again approved the law enforcement technique of "pacing" a vehicle to determine whether it was speeding.[275] There, the police officer testified that he "paced" the defendant's speed on a highway "from a distance of approximately 200 yards for two seconds, calculating that she was traveling at 58 miles per hour in a 55 miles per hour speed zone."[276] The police officer stated that "he began pacing [the defendant] when she started going

---

[269] *Id.* at 730.

[270] *Id.*

[271] *Id.* at 733.

[272] *Id.*

[273] *Id.* at 733–34.

[274] *Id.* at 734.

[275] 463 F. App'x 412, 417 (5th Cir. 2012).

[276] *Id.* at 414.

down a hill while making a leftward curve."[277] The officer also testified to the accuracy of the "pacing method" stating "that he 'check[ed] the calibration' of the speedometer against his radar twice daily," and maintained logs of the checks in accordance with Texas requirements.[278] "In light of the deference given to a district court's factual determinations based on live testimony, [the Fifth Circuit] conclude[d] that the district court did not commit clear error in crediting [the officer's] testimony regarding pacing."[279] The Fifth Circuit found no extrinsic evidence to contradict the officer's testimony.[280] The Fifth Circuit concluded that even if the officer was mistaken that the defendant was in fact speeding, "his method of pacing was objectively reasonable in light of the district court's credibility determination regarding [the officer's] testimony."[281] Because the officer "had an objectively reasonable basis for initiating the stop," the Fifth Circuit held that any factual mistake as to whether the defendant was speeding did not diminish the officer's "legal basis to make the stop."[282]

### 2. Analysis

Here, the Government presented the testimony of Cadet, a copy of the traffic ticket completed by Cadet and a copy of the supplemental report completed by Roniger to establish that Toussaint was speeding at the time of the traffic stop. The Government asserts that the traffic stop was justified because, based on Cadet's testimony regarding the pacing of the vehicle, it was

---

[277] *Id.*

[278] *Id.*

[279] *Id.* at 416.

[280] *Id.*

[281] *Id.* at 417.

[282] *Id.* at 418.

reasonable to conclude that the vehicle was speeding. Toussaint contends that the traffic stop was not justified because the officers did not have an objectively reasonable basis for concluding that a traffic violation occurred.

As noted above, an automobile stop must be reasonable under the circumstances.[283] The Court must determine whether the police officers had "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."[284] While the Fifth Circuit has approved the law enforcement technique of "pacing" a vehicle to determine whether it was speeding, the method of pacing must be objectively reasonable.[285]

Cadet testified that he observed a silver Infiniti coupe driving southbound on Glen Della Drive. Cadet stated that he believed that he "paced" the vehicle for "a block or two" to determine that the vehicle was going 35 miles per hour in a 20 miles per hour speed zone. Cadet described the pacing process as follows: "we get behind the car, and we are doing approximately 35 miles an hour. And we couldn't keep up with the car, so that gave us the—pretty much the idea that 35 was over the speed limit." Cadet could not recall any other critical details of the alleged speeding infraction. Cadet testified that he first saw the silver Infiniti coupe on Glen Della Drive, but he could not recall where on Glen Della Drive he was when he saw the vehicle. Cadet could not recall the distance between his vehicle and the silver Infiniti coupe when he began to pace the vehicle. Further, Cadet could not recall the length of time that he paced the vehicle, testifying only that he believed it was

---

[283] *Id.* at 810.

[284] *Banuelos–Romero*, 597 F.3d at 766.

[285] *See Archuleta*, 463 F. App'x at 417.

for "maybe about a block or two." During the hearing, Cadet did not even recognize a photograph of Glen Della Drive.

Roniger was unable to provide any testimony to corroborate Cadet's testimony on the speed that the silver Infiniti coupe was traveling or on the pacing procedures used. Roniger testified that he was in a vehicle behind Cadet's vehicle on Glen Della Drive, but did not know how fast the vehicles were traveling.

Unlike both *United States v. Castro* and *United States v. Archuleta*, where the pacing occurred on a highway, here, the pacing occurred at night on a residential street. In *Castro*, the officer testified that he paced the vehicle for several miles, whereas here Cadet could not recall the distance that he paced the vehicle. Unlike the officer in *United States v. Archuleta*, Cadet was unable to provide any specific details regarding the pacing process. Cadet did not testify to any procedures he used to insure that his speedometer was accurately calibrated or to any procedures he used to ensure that the speed determination was accurate. Further, Cadet was still in training at the time of the stop. He provided no testimony to show whether he had received any training on pacing procedures at the time of the stop.

Finally, the discrepancies between the supplemental report and speeding ticket further call into question the validity of this stop. The supplemental report completed by Roniger indicates that Toussaint was stopped while traveling northbound on Glen Della Drive. At the hearing, Roniger admitted that this was inaccurate as the vehicle was traveling southbound on Glen Della Drive. The supplemental report indicates that the speed limit on Glen Della Drive was 25 miles per hour.[286]

---

[286] Rec. Doc. 49-2 at 4.

However, the speed limit on Glen Della Drive is 20 miles per hour.[287] Further, the traffic ticket states that the stop occurred at "Butler and US 90." Cadet testified that he was trained to list the closest intersection on the traffic ticket, but at the hearing Cadet testified that the stop occurred near Glen Della Drive and Highway 90.

In light of Cadet's admitted limited experience at the time of the stop, the fact that the Government attributes the mistakes in the paperwork to his limited experience yet expect the Court to ignore his inexperience when considering his testimony on pacing, the fact that Roniger, an experienced officer who was allegedly traveling close behind in another vehicle, could not corroborate the accuracy of the pacing, and the failure to provide specific details on the pacing procedures used, the Court finds that the officers' testimony on pacing lacks credibility. Accordingly, the Court finds the officers' method of pacing was not objectively reasonable. Therefore, the Government has failed to meet its burden of showing that the officers had an objectively reasonable basis to stop the vehicle on November 3, 2013.[288] Without an objectively reasonable basis to initiate the traffic stop, Toussaint's detention was unlawful.[289]

---

[287] Rec. Doc. 63-1 at 1.

[288] In *United States v. Archuleta*, the Fifth Circuit held that any factual mistake as to whether the defendant was actually speeding did not diminish the officer's "legal basis to make the stop" because the officer "had an objectively reasonable basis for initiating the stop." 463 F. App'x at 418. Here, the Court finds that the officers did not have an objectively reasonable basis for initiating the stop because there was no objectively reasonable basis for them to find that Toussaint was speeding.

[289] Because this case fails under the first step of the *Terry* inquiry, the Court need not address whether, under the second step, the officer's actions were reasonably related in scope to the circumstances that justified the stop. Toussaint makes no argument that the officer's actions were not reasonably related in scope to the circumstances that justified the stop.

*C. Fruit of the Poisonous Tree*

Under the fruit of the poisonous tree doctrine, "'all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.'"[290] The Government does not offer any evidence or argument to show a break in the chain of events. As a result, the drugs and gun retrieved at the scene of the stop and any statements Toussaint made to JPSO detectives following his arrest must be suppressed as fruit of the poisonous tree.

## IV. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that Defendant Tosh Toussaint's "Motion to Suppress Evidence and Statements"[291] is **GRANTED.** The drugs and gun retrieved at the scene of the stop and any statements Toussaint made to JPSO detectives following his arrest are suppressed.

**NEW ORLEANS, LOUISIANA**, this ___24th___ day of July, 2015

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[290] *United States v. Jones*, 234 F.3d 234, 243–44 (5th Cir. 2000) (quoting *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir.1998)).

[291] Rec. Doc. 46.

46